$\mathcal{JH}$

| KAREN M. MULVANEY, | ) |
| --- | --- |
| | ) |
| Plaintiff, | ) |
| | ) No. 05 C 4439 |
| v. | ) |
| | ) |
| JO ANNE BARNHART, | ) Magistrate Judge Arlander Keys |
| Commissioner of the Social | ) |
| Security Administration, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Karen Mulvaney, moves this Court for Summary Judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, to reverse or remand the final decision of the Commissioner of Social Security, denying her claim for Disability Insurance Benefits ("DIB"). 42 U.S.C. § 405(g) (2003). Defendant has filed a Cross-Motion for Summary Judgment, asking this Court to affirm the Commissioner's final decision.

**Procedural History**

Karen Mulvaney filed for DIB on November 6, 2001 at age 45. R. at 161. Ms. Mulvaney alleged a period of disability beginning on July 20, 2000 due to back problems. R. at 34, 161. In her reconsideration disability report dated January 24, 2002, Ms. Mulvaney further alleged ongoing pain in her back, hips, and legs; swollen hands; carpal tunnel syndrome; and problems with

concentration and depression due to pain. R. at 39, 200. The

Social Security Administration ("SSA") denied Ms. Mulvaney's

application initially on December 10, 2001 and after

reconsideration on January 16, 2002. R. at 31, 36.

Following Ms. Mulvaney's request for a hearing,

Administrative Law Judge ("ALJ") Steven Templin held a two part

hearing on September 4, 2003 and on April 13, 2004. R. at 17,

18, 28, 40. On November 23, 2004, the ALJ found Ms. Mulvaney

"not disabled" and therefore ineligible for DIB. R. at 28. Ms.

Mulvaney requested review of the unfavorable decision on

December, 13, 2004 and, after receiving the hearing tapes,

submitted additional evidence and a memorandum in support of her

appeal on May 12, 2005. R. at 12, 434-36. The SSA denied Ms.

Mulvaney's request for review on May 31, 2005, making the ALJ's

decision the final agency decision. R. at 5. Ms. Mulvaney filed

the present action on August 3, 2005.

## Factual Background

### I. The September 4, 2003 Hearing Session

Ms. Mulvaney appeared at the first of two hearing sessions

on September 4, 2003 with her husband and attorney. R. at 17.

Medical experts ("ME's") Dr. Joseph Cools and Dr. Daniel Grizadas

also testified. R. at 17.

2

## A. Testimony of Ms. Mulvaney

At the first hearing session, Ms. Mulvaney described her twenty-one years as a patient care associate at Christ Hospital. R. at 455-56. She testified that, in this role, she took blood samples and also functioned much like a certified nursing assistant, doing everything from moving equipment to bathing patients. R. at 463-64. Ms. Mulvaney injured her back while lifting a patient in December 1999. R. at 116. She testified that, after the injury, she was reassigned to "light duty" – processing paperwork in the billing department. R. at 464. Ms. Mulvaney testified that during these light duties she had to get up and walk almost every hour due to constant back pain. R. at 472. Ms. Mulvaney believed that the hospital later terminated her rather than employing her in another position because she had worked for so long at the facility. R. at 465. Ms. Mulvaney also believed that the hospital fired her after a doctor asserted that she could go back to her normal job. R. at 473. However, she testified that a functional capacity report for her Worker's Compensation claim shows that she could not return to her work because she was unable to lift 50 pounds or more. R. at 473. Ms. Mulvaney stated that she tried unsuccessfully to find work and was not eligible for state-provided work rehabilitation. R. at 465-66.

3

Ms. Mulvaney testified that, after leaving Christ Hospital, she worked as a bus driver in 2001, driving a school bus for two hours in the morning and two hours in the afternoon, and cleaning, checking, and refueling the bus. R. at 454-55. Ms. Mulvaney testified that she left the job after six months because her back "went out again," and she was in pain the entire time she drove the bus. R. at 454. She stated that she had been improving, but that her condition worsened while she drove the bus, causing pain in her lower back, hips, and legs. R. at 455.

Ms. Mulvaney testified that, after she injured her back at Christ Hospital, she underwent treatment, including back adjustments, pain medicine and steroid shots. R. at 456. She stated that she has declined a recommended back surgery because she understands that it will not significantly improve her condition. R. at 456. Ms. Mulvaney testified that she is under the care of a neurosurgeon, Dr. Maltezos, and a chiropractor, Dr. Astroth. R. at 456-57. Ms. Mulvaney testified that she sees Dr. Astroth once or twice a month for a back alignment, which sometimes decreases her pain, but never completely relieves it. R. at 457, 461. Ms. Mulvaney also testified that she takes Advil and Darvocet, which "cut the edge" but do not eliminate her constant pain. R. at 457, 459-60. Ms. Mulvaney testified that she never sleeps a full night because low back pain causes her to

4

wake up every couple of hours. R. at 457-59. Ms. Mulvaney testified that she is in pain "all the time" and that she experiences no pain-free hours or days. R. at 457-59.

With regard to her daily activity level, Ms. Mulvaney testified that she tries to maintain her pre-injury activities, such as cooking and cleaning, but that the tasks now take longer and when she 'overdoes it' she can't do anything the next day. R. at 459. She testified that she goes to church on Sundays and visits family. R. at 460. She testified that she shops for groceries on a regular basis and can carry groceries weighing up to about 10 pounds. R. at 460-61.

## B. Testimony of Dr. Grizadas, Medical Expert

Dr. Grizadas, a qualified orthopedic surgeon, testified that the record contains medical evidence of several medically determinable impairments. R. at 445. He testified that spondylolisthesis at L5-S1 is shown through X-ray and magnetic resonance imaging ("MRI") evidence; degenerative arthritis of the entire lumbar spine is described in a CT scan, MRI scans, and X-rays; extensive degenerative arthritis of the cervical spine is demonstrated in X-rays; and an electromyogram ("EMG") reveals carpal tunnel syndrome, but no cervical, thoracic, or lumbar radiculopathy. R. at 445-46. Dr. Grizadas opined that these conditions and impairments would affect Ms. Mulvaney's ability to

5

perform work-related activities, but that they do not meet or equal in severity the criteria of any of the impairments listed by the Commissioner in 20 C.F.R. part 404 Subpart P Appendix 1 (the "Listings"). R. at 446-47. He also opined that Ms. Mulvaney could perform "light work," as was found in the two residual functional capacity ("RFC") reports of record at that time. R. at 447. More specifically, Dr. Grizadas testified that Ms. Mulvaney could: occasionally lift 20 pounds and frequently lift 10 pounds; stand, sit, and walk for six hours; and occasionally squat, stoop, kneel, and crawl. R. at 447. He testified that Ms. Mulvaney could not use ropes, ladders, or scaffolds, but that she had no manipulative or visual limitations. R. at 447. Lastly, Dr. Grizadas testified that Ms. Mulvaney should not work at unprotected heights or operate foot controls or unprotected machinery. R. at 447-48.

With regard to Ms. Mulvaney's pain, Dr. Grizadas testified that chronic pain could be consistent with the evidence of Ms. Mulvaney's degenerative arthritis, and noted that she took Darvocet and Advil to treat her pain. R. at 448-49. However, when considering the "extent of the problem," Dr. Grizadas placed "some strength" in a report by treating physician Dr. Mozwecz, dated June 3, 2003. R. at 449. As Dr. Grizadas testified, the report describes Ms. Mulvaney's lower back pain as "occasional,"

6

states that Ms. Mulvaney is on no chronic medication, and reveals that a neurological examination was normal. R. at 393. However, Dr. Grizadas misstated the year of this note, which was written during 1993. R. at 393.

## C. Testimony of Dr. Cools, Medical Expert

Dr. Cools, a licensed psychologist, who appeared at the behest of the ALJ and who had not examined or treated Ms. Mulvaney, testified at the first session regarding Ms. Mulvaney's mental impairments. R. at 450. Dr. Cools concurred with a diagnosis in the record of "adjustment disorder with depressed and anxious mood." R. at 450-51. Dr. Cools testified that such a condition is secondary to a patient's perception of pain and is likely to continue as long as the pain persists. R. at 451. Dr. Cools found no evidence in the record of severe depression or anxiety, and opined that the adjustment disorder would have only a minimal effect on Ms. Mulvaney's RFC. R. at 451. Dr. Cools stated that the pain itself, and not the adjustment disorder, causes Ms. Mulvaney's symptoms, such as difficulty sleeping. R. at 452. However, upon cross-examination by Ms. Mulvaney's attorney, Dr. Cools agreed that such a psychological condition could add to the perception of pain, creating a "vicious cycle." R. at 453.

## D. Testimony of Edward Pagella, Vocational Expert

Although the ALJ asked vocational expert ("VE") Edward

Steffan to attend the session, Mr. Steffan appeared but did not

testify. R. at 17, 63. Instead, VE Edward Pagella completed an

interrogatory in the month following the session. R. at 17-18.

In the October 2003 interrogatory, Dr. Pagella defined Ms.

Mulvaney's vocational profile: a younger individual with a high

school diploma and with past relevant work as bus driver, billing

clerk, patient care associate, and phlebotomist. R. at 146. Dr.

Pagella was presented with a hypothetical individual with the RFC

described by Dr. Grizadas at the first session. R. at 146. The

hypothetical individual was limited from:

more than occasionally lifting and/or carrying up to 20
pounds at a time, or 10 pounds frequently; climbing
ropes, ladders, or scaffolds; working at unprotected
heights or around dangerous machinery; more than
occasionally climbing ramps or stairs, balancing,
stooping, kneeling, crouching, or crawling; or performing
repetitive, forceful, torqueing motions with her hands
and upper extremities.

R. at 146. Assuming these hypothetical limitations, Dr. Pagella

opined that someone with Ms. Mulvaney's vocational skills could

"return back to her original jobs" as a billing clerk, patient

care associate, and phlebotomist and could "perform a variety of

unskilled light and sedentary occupations." R. at 146.

Ms. Mulvaney and her attorney responded to the interrogatory

8

in an October 27 letter to the ALJ. R. at 147. Ms. Mulvaney described her limitations in relation to her previous jobs. R. at 148. She wrote that she cannot return to her jobs as patient care associate or phlebotomist, because those jobs require that she be able to lift 50 pounds and involve very hard work ("moving, lifting, washing, drawing, feeding, transporting patients on your feet for ten hours…"). R. at 148. She wrote that she only held the billing clerk position so that she could remain at work while her back was healing. R. at 148. She described difficulty with standing more than 1 ½ hours, significant back pain, and an incident in which her leg "gave out" on her. R. at 149.

## II. The April 13, 2004 Hearing Session

Ms. Mulvaney's attorney requested the opportunity to question VE Pagella about his responses and to submit additional medical evidence. R. at 18, 147, 225. In order to hear testimony from a vocational expert and afford Ms. Mulvaney's attorney the requested opportunity for cross examination, the ALJ scheduled a second hearing session for April 13, 2004. R. at 18. Ms. Mulvaney's attorney withdrew for health-related reasons and Ms. Mulvaney appeared with a new attorney at the second hearing session. R. at 18, 475. MEs Cools and Grizadas testified at the second session, as did VE Pagella and Ms. Mulvaney. R. at 18.

9

## A. Testimony of Ms. Mulvaney

At the second hearing session, Ms. Mulvaney testified that her condition in general had worsened since the last session. R. at 486. Ms. Mulvaney described pain in her shoulders, especially on the left; tingling and numbness in her hands and left arm; lower back pain radiating down into her hips; and pain with occasional numbness in her legs. R. at 491. Ms. Mulvaney stated that her pain is usually a five or six on a ten-point scale, but that it increases to an eight when she over-exerts herself. R. at 494.

Ms. Mulvaney testified about the effect of the pain on her mental state. R. at 487-89. She expressed frustration with her constant pain, describing her life as "just a mess." R. at 487. She related sometimes feeling "worthless" or like "life isn't worth living anymore" and at times crying uncontrollably. R. at 488. She testified that she had thought about killing herself. R. at 487. She testified that her mental state interferes with her marriage, and that her family thinks she is "a little bit irritable and cranky most of the time." R. at 489. She testified that she wakes up every couple of hours during the night because of pain in her back, legs, and left shoulder; that she always wakes up exhausted; and that she naps a couple of times each day. R. at 487-88.

At the second session, Ms. Mulvaney again testified about her daily activities. R. at 490. She testified that she briefly visits family members and attends church by sitting at the back where she can move around. R. at 490. She stated that she drives a little, but is usually driven by a family member. R. at 490. She testified that her legs sometimes do "weird things" or give out on her, and that her arms don't always function correctly, causing her to drop objects unexpectedly. R. at 490-92. She testified that she goes on walks but can only go two or three blocks before her pain increases. R. at 492. She testified that she takes showers because she cannot get in and out of the tub, and that she no longer vacuums or cleans the bathroom. R. at 494. She testified that she is still able to do some chores, like the dishes and laundry, but that the tasks take additional time. R. at 495. She stated that she has gained twenty or thirty pounds in the past year due to her inactivity. R. at 490-91.

Ms. Mulvaney testified at the second session about medical treatment for her pain. R. at 493. She testified that she has had three or four steroid injections, but stopped because the relief was temporary and she experienced side effects. R. at 492. She testified again that she does not want to have surgery because she understands it would only result in a small

11

improvement and would involve serious risks. R. at 489, 493. She stated that her doctor is planning to start her on an anti-depressant for people with chronic pain, and that she currently takes Ultram, which makes her sleepy. R. at 493, 496.

## B. Testimony of Dr. Grizadas, Medical Expert

At the second session, Dr. Grizadas again testified that the record contains evidence of several medically determinable impairments, including spondylolisthesis, degenerative arthritis, and carpal tunnel syndrome. R. at 480. He testified again that the EMG of record contains no evidence of cervical, thoracic, or lumbosacral radiculopathy. R. at 480. In addition to the impairments he had noted at the first session, Dr. Grizadas testified that an MRI reports a herniated intervertebral disc at L3-L4.[1] R. at 480. Dr. Grizadas opined that Ms. Mulvaney has mechanical back pain as a result of the spondylolisthesis. R. at 481. Dr. Grizadas again opined that Ms. Mulvaney's impairments affect her ability to work, but do not meet or equal in severity any of the Listings. R. at 481.

When questioned about Ms. Mulvaney's RFC during the second session, Dr. Grizadas discussed a recently submitted RFC report. R. at R. at 481-82. This report, Exhibit 13 F, was completed by

---

[1] Although Dr. Grizadas did not mention disc herniation during the first hearing session, evidence of the disc herniation was available prior to the first session in a revised MRI report and in a letter. R. at 265, 270.

12

Ms. Mulvaney's treating chiropractor, Dr. Astroth, and approved by her treating physician, Dr. Mozwecz. R. at 418. The report states in part that Ms. Mulvaney can use her hands, fingers, and arms for less than ten percent of a workday, using the left side, and for less than five percent of a workday using the right side. R. at 417. Dr. Grizadas stated that there is no evidence in the record to support such limitations on reaching, grasping, and fine manipulation. R. at 482. The report also included a note recommending new evaluation through MRI and EMG. R. at 420. Dr. Grizadas pointed out that no new tests had been conducted.[2] R. at 482.

Dr. Grizadas again testified that, during an eight hour workday, Ms. Mulvaney could frequently lift 10 pounds; sit for six hours; and occasionally crouch, stoop, kneel and crawl. R. at 482-83. Dr. Grizadas testified that Ms. Mulvaney can stand or walk for at least two hours out of an eight hour workday (whereas he had noted a six-hour limit at the first session). R. at 447, 482. Dr. Grizadas again testified that Ms. Mulvaney should never use ropes, ladders, or scaffolds and should not be at unprotected heights, use foot controls, or be near moving machinery. R. at 482-84.

---

[2] Ms. Mulvaney later testified that she had not had the EMG because she did not think it was necessary and because the co-payment would have been significant. R. at 498-500.

13

While he had earlier testified to no manipulative limitations, Dr. Grizadas testified at the second session that Ms. Mulvaney could do no more than occasional fingering due to carpal tunnel syndrome. R. at 447-48, 483. Dr. Grizadas noted that the record shows no recent findings of carpal tunnel syndrome or upper extremity complaints, and that the symptoms could have receded or disappeared due to Ms. Mulvaney's inactivity. R. at 483-84. However, the ALJ pointed out later in the session, that even if the symptoms had resolved, they could recur in the event of frequent use. R. at 497. Dr. Grizadas accordingly agreed that a limitation of no more than occasional use of the upper extremities is appropriate. R. at 497-98.

## C. Testimony of Dr. Cools, Medical Expert

At the second session, Dr. Cools again agreed with the diagnosis of adjustment disorder, with depressed and anxious mood, and again concluded that the condition was secondary to the chronic pain syndrome and would only minimally affect Ms. Mulvaney's work-related capabilities. R. at 485. Dr. Cools noted that the record contains no other evidence of mental impairment, such as treatment through anti-depressant medication. R. at 486.

## D. Testimony of Edward Pagella, Vocational Expert

Mr. Pagella appeared personally at the second session. R.

14

at 501. First, Mr. Pagella described Ms. Mulvaney's vocational profile as he had in the interrogatory. R. at 146, 501-02. He testified that an individual with the RFC described by Dr. Grizadas in the second session could perform sedentary work, with only occasional use of the upper extremities, and could not perform Ms. Mulvaney's previous relevant occupations. R. at 502. Nevertheless, Mr. Pagella testified that a person with Ms. Mulvaney's vocational profile and RFC could perform work in the national economy. R. at 502-03. Within the category of sedentary, unskilled occupations, Mr. Pagella testified that such an individual could perform three service-type occupations: loss prevention clerk, information clerk, and charge account clerk. R. at 503-04. None of the three occupations would require more than occasional use of the upper extremities, and all were found in numbers in excess of 1,800 in the Chicago metropolitan region and in several other regions in the national economy. R. at 504.

During cross-examination by Ms. Mulvaney's attorney, Mr. Pagella testified that an individual could sit or stand at will in any of the three occupations. R. at 505. Mr. Pagella also testified that, if the hypothetical person had difficulty writing or using her hands, she could still fill the charge account clerk position, since it requires placing checkmarks in boxes rather than writing. R. at 505. Based on counsel's question, Mr.

15

Pagella indicated that if the hypothetical person were to miss four or more workdays per month, she would not be able to perform the three proffered service jobs or any other occupation. R. at 505. Mr. Pagella also testified that, if the hypothetical person could not maintain a consistent amount of alertness and concentration for at least sixty-seven percent of the day, she would not be capable of any substantial gainful activity. R. at 506.

## III. Medical History

In addition to the live testimony of Ms. Mulvaney and the various experts, the ALJ also considered the medical records on file.

### A. Background and Treatment

Ms. Mulvaney's claim of carpal tunnel syndrome is supported in the record by Dr. Douglas Koltun's report. R. at 266. Dr. Koltun conducted an EMG on April 30, 1999, which revealed evidence consistent with moderate carpal tunnel syndrome that is slightly more pronounced on the right side than on the left. R. at 266. Dr. Koltun noted that Ms. Mulvaney described numbness in both hands for 1 ½ months, nocturnal bilateral "leg jumping" for one year, and eighteen years of low back pain, with occasional posterolateral thigh radiation. R. at 266-67. In addition to moderate carpal tunnel syndrome in the wrists, Dr. Koltun

16

identified "[m]ild bilateral lower extremity sensory neuropathy,"
but found no evidence of cervical, thoracic or lumbosacral
radiculopathy. R. at 266.

The record contains numerous documents supporting Ms.
Mulvaney's claim of back problems during the period beginning
July 20, 2000. In brief, the documents show that, for several
years, Ms. Mulvaney experienced moderate lower back pain,
associated with disc space narrowing, degenerative disc disease,
and spondylolisthesis; that in late 1999 she injured her back at
work; that the resulting severe lower back pain and leg pain
improved somewhat with treatment in later months; that in mid-
2001 she developed excruciating leg pain and was diagnosed with a
disc herniation; and that her lower back pain and leg pain
resulting from the spondylolisthesis and disc herniation
persisted through the time of the hearing.

First, Ms. Mulvaney experienced a history of lower back pain
for which she reported visiting a chiropractor on a semi-regular
basis as early as June 1993. R. at 393. In 1996, Ms. Mulvaney
complained of "low back pain" and her treating chiropractor, Dr.
Robert Astroth, ordered an X-ray of the lumbar spine, which
revealed disc space narrowing at L2-3, L4-5 and L5-S1. R. at
260. Ms. Mulvaney also complained of "neck stiffness" and an X-
ray of the cervical spine that same year revealed "early

17

[degenerative joint disease] of the cervical spine at the levels of C5-6 and C6-7." R. at 261.

An MRI from May 4, 1998 revealed mild spinal canal narrowing at L5 and S1 due to grade I spondylolisthesis between L5 and S1, and multiple level disc degeneration at L2-3, L3-4, and L4-5. R. at 258. On May 15, 1998, Ms. Mulvaney described her pain as varying from a four to an eight on a ten-point scale. R. at 105. In a corresponding Cervical Disability Index, Dr. Astroth calculated Ms. Mulvaney's disability as "moderate." R. at 106.

Next, the record shows that Ms. Mulvaney suffered a back injury while working as a patient care associate at Christ Hospital in December 1999. R. at 116. Ms. Mulvaney reported that, while she and another nurse were pulling a patient up in bed, she "heard a pop" in her lower back, and soon after felt pain in her right leg. R. at 116. Ms. Mulvaney saw a doctor on December 4, 1999 and returned to work the following week. R. at 114. When her lower back became very painful, she saw Dr. Beverly Deck at Christ Hospital, and was referred to orthopedist Dr. Richard D. Lim. R. at 114.

An X-ray was completed on December 13, 1999 that revealed (1) facet joint arthritis of the lower lumbar spine, (2) 7-8mm anterior subluxation of the L5 in relation to S1, with narrowed L5-S1 disk, (3) narrowed L4-5 disc and markedly narrowed L2-3

18

disk, and (4) right lateral translation of the L3 vertebral body
by about 5-6mm in relation to L2.  R. at 107.  On December 18,
1999, Dr. Lim diagnosed L5 spondylolisthesis.  R. at 108.  Dr.
Lim restricted Ms. Mulvaney from lifting, carrying, pushing, or
pulling more than 10 pounds, and from bending, kneeling,
twisting, or squatting.  R. at 111.

   Ms. Mulvaney underwent an MRI on December 28, 1999, which
revealed grade I spondylolisthesis of L5, with disc space
narrowing and degenerative disc disease and disc bulge at L2-3
and L4-5.  R. at 253.  The MRI report equated the findings to
those reported after the 1998 MRI.  R. at 253-54.

   After her injury, Ms. Mulvaney was treated by Dr. Astroth.
Indeed, the record contains treatment notes from Dr. Astroth
extending from September 1996 through July 2004.  R. at 124-25,
129-45, 286-337, 376-81.  An initial report on January 7, 2000
indicates that Dr. Astroth reviewed the December 1999 X-ray and
MRI and diagnosed "lumbosacral subluxation and [lumbar
sprain/strain] related to low back pain and vertebrogenic
radiculitis complicated by disc degeneration."  R. at 115.  Dr.
Astroth treated Ms. Mulvaney through back adjustment, ice
applications, and a restriction on activities.  R. at 115.  The
report indicates planned treatment including rehabilitative
stretching, rehabilitative strengthening, and range of motion

exercises. R. at 115.

The January 7, 2000 report states that Ms. Mulvaney described her pain as varying between a six and an eight on a ten-point scale, and that an Oswestry Back Pain Index Questionnaire returned a score of sixty-two percent, meaning "crippled" disability. R. at 114. A report dated February 9, 2000 indicates an improved condition, with pain varying from four to six on a ten-point scale and a Revised Oswestry Disability Index result of forty-four percent or "severe" disability. R. at 113. The February 9 report also includes an updated diagnosis, which includes spondylolisthesis and pain in the pelvic region. R. at 113. The symptoms documented in the February 9 report include diminishing lower back pain and shooting pains in tne right groin/inner thigh area. R. at 113.

Dr. Astroth requested a functional capacity evaluation, which was conducted by NovaCare Outpatient Rehabilitation on February 21, 2000. R. at 119. The Work Capacity Specialist found Ms. Mulvaney capable of frequent standing, modified twisting, pushing or pulling 200 pounds in a wheelchair, and lifting 30 pounds maximum and 15 pounds frequently. R. at 226-27. Because Ms. Mulvaney could not lift 50 pounds maximum and 25 pounds frequently, the Specialist concluded that she could not perform work as a patient care associate. R. at 227. The

Specialist also concluded that Ms. Mulvaney's "musculoskeletal status may slightly limit her ability to perform functional activities." R. at 229. While observing the simulated work activities, the Specialist noted that Ms. Mulvaney's complaints of pain did not always correlate with objective "pain mannerisms" and that she performed one task after claiming that she could not do it. R. at 229, 250.

A release letter by Dr. Astroth, dated March 20, 2000, indicates that Ms. Mulvaney had reached "maximal improvement" under his care and was released from office visits. R. at 242. Dr. Astroth recorded Ms. Mulvaney's continuing symptoms, including "low back pain and stiffness, pain in the right sacro-iliac joint, right thigh, and right groin area... [and] difficulty crossing the right leg over the left." R. at 242. Based on patient exams, an MRI report, and the functional capacity evaluation, Dr. Astroth opined that Ms. Mulvaney should perform work that is less physically demanding than the patient care associate position. R. at 243.

Ms. Mulvaney had been employed as a Billing Clerk at Christ Hospital since the December injury, but she was terminated from Christ Hospital in July 2000. R. at 168. July 20, 2000 is the alleged onset date of Ms. Mulvaney's disability. R. at 20.

In August 2000, Dr. Astroth referred Ms. Mulvaney to Dr.

21

Stavros Maltezos of CNS Neurological Surgery. R. at 240. After
an examination on August 31, Dr. Maltezos recorded Ms. Mulvaney's
diagnoses as "[d]egenerative L5-S1 spondylolisthesis with back
pain and moderate right radiculopathy activated by work-related
lumbar strain." R. at 276.

Ms. Mulvaney saw Dr. Maltezos the following year in June
2001, the same month that she left her job as a bus driver. R.
at 168, 273. Ms. Mulvaney complained of "severe stabbing pain
from the left groin to the low back radiating to the left leg
with numbness for one week" and Dr. Maltezos ordered an MRI on
June 20, 2001. R. at 236. The MRI revealed: (1) grade I-II
anterolisthesis of L5 on S1, with disc space narrowing at L5-S1
level, (2) disc space narrowing at L2-3, and (3) increased signal
intensity in the anterior - superior aspect of the L3 vertebral
body on the T2 weighted images, consistent with degenerative
change. R. at 236. The original MRI report indicated no
evidence of disc herniation, spinal stenosis, or foraminal
narrowing. R. at 236. An X-ray of the lumbar spine on that same
date also revealed degenerative changes, with disc space
narrowing. R. at 239. During June 2001, Dr. Maltezos completed
an application on Ms. Mulvaney's behalf for a disabilities
parking placard, indicating "cannot walk 200 feet without
stopping to rest." R. at 231.

In a letter to Dr. Mozwecz dated June 28, 2001, Dr. Maltezos wrote that Ms. Mulvaney had "recurrent radicular symptoms" that recently occurred for the first time in her left leg. He described the new symptoms: "After experiencing some initial tingling, she awoke one day with severe pain radiating into the hip, groin and anteromedial thigh. The pain was initially excruciating." R. at 273. Dr. Maltezos noted that Ms. Mulvaney had a "significant partial response to a Medrol Dosepak" but still had a "fair amount of discomfort in the leg." R. at 273.

Dr. Maltezos next ordered a CT scan, which was completed on July 2, 2001. The CT scan revealed (1) large left lateral disc herniation at L3-4, (2) grade I spondylolisthesis and severe disc space narrowing at L5-S1, (3) disc bulging at L4-5, and (4) severe disc space narrowing and mild bulging of degenerated disc at L2-3. R. at 103-04. The June 20 MRI report was amended to show that comparison with a CT Scan showed a large left lateral disc herniation in the left L3-4 neural foramen. R. at 265.

On July 26, 2001, Dr. Maltezos sent a letter to Dr. Mozwecz, indicating that the CT scan had revealed a disc herniation that accounted for Ms. Mulvaney's radicular symptoms. R. at 270. Dr. Maltezos wrote that surgery would likely be required to resolve the disc herniation, but that Ms. Mulvaney was not willing to have the surgery. R. at 270. He indicated that Ms. Mulvaney

23

agreed to treatment through epidural steroid shots. R. at 270.
A report from Advocate Christ Medical Center indicates that Ms.
Mulvaney had an epidural shot on August 9, 2001 and that a second
injection was planned for two weeks later. R. at 262.

A final letter from Dr. Maltezos to Dr. Mozwecz is dated
October 11, 2001. R. at 268. In it, he notes that Ms.
Mulvaney's radiculopathy had been treated with "good symptomatic
resolution" but that she still experienced back pain and sciatica
associated with spondylolisthesis and her 1999 work injury. R.
at 268. He described Ms. Mulvaney as "limited in her functional
capabilities" and "always in a significant amount of discomfort,"
with movement triggering additional pain. R. at 268. Dr.
Maltezos wrote that he recommended surgery to Ms. Mulvaney, given
her "present level of chronic pain and dysfunction." R. at 268.
The precise surgery proposed was "L5-S1 posterolateral and
posterior lumbar interbody fusion with associated pedicle screw
and interbody fixation." R. at 268. Dr. Maltezos described it
as a "large operation" that was "not without risk." R. at 268.

A letter from Dr. Astroth to an insurance company indicates
that Ms. Mulvaney was in a car accident on December 12, 2002 and
was treated for subsequent neck pain and low back pain from
December 2002 through April 2003. R. at 101. The record
contains no other reference to the accident or its impact on Ms.

Mulvaney's symptoms.

On June 27, 2003, Dr. Astroth completed a Revised Oswestry Chronic Low Back Pain Disability Questionnaire and a Neck Pain Disability Index Questionnaire. R. at 366-67. At that time, Ms. Mulvaney reported pain in her wrists, legs, hips, and lower back, ranging from a six at best to an eight at worst on a ten-point scale. R. at 368. Dr. Astroth calculated Ms. Mulvaney's overall disability level as forty to sixty percent (or "severe") for neck pain and sixty to eighty percent (or "crippled") for back pain. R. at 365. At that time, Dr. Astroth recommended further evaluation using new MRI and EMG results. R. at 365.

X-rays were also taken on June 27, 2003, and Dr. Astroth reported their results, including: advanced degenerative disc disease and degenerative joint disease of the cervical spine at C4-5, C5-6, and C6-7 and degenerative disc disease at all levels of the lumbar spine, with severe spondylosis at the left L4-L5 vertebral body with pelvis rotated posterior. R. at 371.

The record shows that, prior to the first hearing session, Ms. Mulvaney's treating physician, Dr. Mozwecz, prescribed Darvocet for her pain, and that prior to the second hearing session, he began prescribing Mobic and Ultram. R. at 364, 421.

After the first hearing session was held, Dr. Astroth submitted a Statement of Health for Ms. Mulvaney to the SSA. R.

at 401. Dated December 9, 2003, the letter indicated Ms. Mulvaney's diagnoses as chronic neck pain and chronic low back pain each associated with disc degeneration and spondyloarthritis (degenerative joint disease) and radiculitis. R. at 401. Dr. Astroth opined that Ms. Mulvaney's condition was poor and would not improve. R. at 401. Dr. Astroth wrote that Ms. Mulvaney would suffer continued degenerative changes in her spinal facets and discs, leading to fibrosis and otseophytosis, and would most likely require orthopedic surgery. R. at 401.

On April 9, 2004, just prior to the second hearing session, Dr. Astroth completed an RFC Questionnaire on which Dr. Mozwecz indicated his approval. Record 414-27. Dr. Astroth incorporated as attachments the findings of his June 27, 2003 examination and his December 9, 2003 letter. R. at 419-26. Dr. Astroth indicated that Ms. Mulvaney was not a malingerer, that her pain occurred daily, and that it was well founded in the objective medical issues; emotional factors played no role in the severity of her symptoms and functional limitations. R. at 414-15. Dr. Astroth indicated that Ms. Mulvaney's experience of pain and other symptoms would interfere with the attention and concentration needed to perform simple work tasks on a constant basis (more than sixty-six percent of the workday). R. at 415. Dr. Astroth estimated Ms. Mulvaney's work-related functional

capabilities to include: (1) walking up to three city blocks; (2) sitting or standing up to fifteen minutes at a time; (3) sitting, standing, or walking for a total of up to two hours in an eight-hour day; (4) occasionally lifting less than 10 pounds; (5) rarely twisting, stooping, crouching or climbing ladders or stairs; and (6) reaching, handling or fingering no more than five percent of the workday with the right side and no more than ten percent of the workday with the left side. R. at 415-17. Dr. Astroth indicated that, throughout the workday, Ms. Mulvaney would need to walk for five to ten minutes every fifteen minutes, shift positions at will, and take frequent unscheduled breaks of fifteen to thirty minutes. R. at 416. Further, Dr. Astroth indicated that Ms. Mulvaney would likely be absent from work more than four days per month. R. at 417.

The record contains fewer documents relating to Ms. Mulvaney's claimed mental impairments. Ms. Mulvaney began treatment with Dr. Gokhale, a psychiatrist, in 2004 after both hearing sessions were completed. R. at 100. The record contains Dr. Gokhale's progress notes dated June 19, August 14, and September 20. R. at 158-60.

On a September 20, 2004 evaluation form, Dr. Gokhale diagnosed Ms. Mulvaney with major depression and chronic back pain, and indicated a score of fifty on the Global Assessment of

27

Functioning (GAF) scale. R. at 95. A score of 50 on the GAF indicates "serious symptoms" or "serious impairment in social, occupational, or school functioning." American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, DSM-IV* 32 (4th ed.1994).

Dr. Gokhale indicated the presence of a chronic affective disorder, with symptoms persisting for more than three years and causing more than a minimal limitation on work activities. R. at 99. Dr. Gokhale marked several areas of daily living and socializing as those in which Ms. Mulvaney had marked or extreme difficulty, including grooming, personal hygiene, cleaning, and getting along with family, friends and neighbors. R. at 97. Dr. Gokhale noted that Ms. Mulvaney suffered from no loss in cognitive abilities, except that she had "poor concentration" and was "more forgetful." R. at 95. Dr. Gokhale indicated that Ms. Mulvaney had marked or extreme difficulty in several areas of concentration, persistence or pace. R. at 98. With regard to treatment, Dr. Gokhale listed one medication that had been tried and another, Cymbalta, currently being tried. R. at 95, 100.

After the ALJ issued his decision, Ms. Mulvaney submitted additional medical evidence to the Appeals Council. R. at 433. Ms. Mulvaney included a lumbar spine MRI report with findings substantially similar to those on previous reports, including

multilevel bulging and facet arthropathy, disc herniation at L4-L5, and degenerative spondylolisthesis at L5-S1. R. at 438. Ms. Mulvaney also included a left shoulder MRI report, finding degenerative change of the acromioclavicular joint, with inferior osteophyte formation in the distal clavicle, and tendinopathy. R. at 437.

## B. Consultants to the Disability Determination Services

DDS Physician Dr. Young-Ja Kim completed an RFC Assessment on November 27, 2001 based on a review of Ms. Mulvaney's file. R. at 278-85. Dr. Kim commented that Ms. Mulvaney had "recent onset of L3 radiculopathy with good response to treatment" and decreased range of motion in her back with "full strength maintained." R. at 285. He described her symptoms as "[i]ntermittent left thigh paresthesis with pain and intermittent right sciatica." R. at 285. He confirmed that an MRI supported a recommendation of surgery, which Ms. Mulvaney had declined. R. at 285. Overall, Dr. Kim concluded that Ms. Mulvaney could perform "light work." R. at 285. Dr. Kim found Ms. Mulvaney capable of: lifting 20 pounds occasionally and 10 pounds frequently; and standing, sitting or walking for about six hours during an eight-hour workday. R. at 279. Dr. Kim indicated no postural limitations, such as climbing, kneeling, or crouching; and no manipulative, visual, communicative or environmental

limitations. R. at 280-82.

DDS Physician Dr. Robert England completed an RFC Assessment on April 30, 2002, based on a review of Ms. Mulvaney's file. R. at 355-62. Dr. England described Ms. Mulvaney's condition as degenerative disc disease, with radiculopathy, with reduced range of motion in the spine, but with reflexes and strength within the normal limits. R. at 362. Dr. England described Ms. Mulvaney's symptoms as "intermittent left thigh parasenthesis with pain." R. at 362. Overall, Dr. England concluded that Ms. Mulvaney could perform a "normal daily routine" and work at the "light exertional level." R. at 362.

Dr. England found Ms. Mulvaney capable of: lifting 20 pounds occasionally and 10 pounds frequently; and standing, sitting or walking for about six hours during an eight-hour workday. R. at 356. To support these conclusions, Dr. England referred to Ms. Mulvaney's normal reflexes and cited to the June 20, 2001 MRI as showing no evidence of disc herniation, spinal stenosis, or foraminal narrowing. R. at 356. Dr. England indicated Ms. Mulvaney's ability to frequently balance, stoop, kneel, crouch, crawl, or climb ramps and stairs, and to occasionally climb a ladder, rope, or scaffold. R. at 357. Dr. England again referred to the June 20 MRI to support his conclusions as to postural limitations. R. at 357. Dr. England indicated no

manipulative, visual, communicative or environmental limitations.
R. at 358-59.

Psychiatric Consultant Dr. Mark A. Amdur completed a
psychiatric examination on April 18, 2002. R. at 338-40. Dr.
Amdur documented Ms. Mulvaney's claim of "constant pain" in her
back, legs, and hips, and numbness and tingling in her hands. R.
at 338. Dr. Amdur noted that, with regard to Ms. Mulvaney's
chronic pain, there was "no reason to doubt the validity of her
pain complaints." R. at 340. He also noted that, secondary to
the pain, Ms. Mulvaney reported difficulty concentrating,
difficulty sleeping, irritability, and depression, and that she
reported limited daily activities which included attending church
weekly and visiting friends once a month, but little or no
housework. R. at 338-39. Dr. Amdur observed that Ms. Mulvaney
could focus her attention, speak coherently, and understand
questions. R. at 340. Dr. Amdur diagnosed Ms. Mulvaney with an
adjustment disorder with depressed and anxious mood. R. at 340.
He stated that her depressed and anxious mood conveyed additional
limits on her ability to tolerate stress and maintain her
attention and concentration. R. at 340.

DDS mental health consultant Bronwyn Rains completed a
Psychiatric Review Technique Form on April 25, 2002. R. at 341-
54. Ms. Rains diagnosed Ms. Mulvaney as having an adjustment

disorder with depressed mood, a psychological impairment that
was, in her view, not severe. R. at 341, 344. Ms. Rains
indicated that this psychological impairment would result in mild
functional limitations, including: restriction of activities of
daily living, difficulties in maintaining social functioning, and
difficulties in maintaining concentration, persistence, or pace.
R. at 351.

After the final hearing session and prior to issuing a
decision, the ALJ arranged for an additional psychological
examination of Ms. Mulvaney. R. at 508. Dr. Gregory Rudolph
completed the examination on May 25, 2004. R. at 428-432. Dr.
Rudolph conducted a Minnesota Multiphasic Personality Inventory-2
(MMPI-2). R. at 431. The test results were invalid because Ms.
Mulvaney's scores suggested a tendency to exaggerate problems and
to place herself in a less-than-favorable light, causing some
scores to be significantly elevated. R. at 431. Based on the
examination, Dr. Rudolph concluded that Ms. Mulvaney was oriented
to reality, had appropriate memory recall, had good knowledge of
general information, was able to use good judgment, and was
capable of using reasoning skills. R. at 430-31. He observed
that she was cleanly dressed, polite, and coherent. R. at 429-
30. He described her mood as reflecting a "mild tone of
depression." R. at 429.

**IV. The November 23, 2004, Decision of the ALJ**

In an opinion dated November 23, 2004 the ALJ found that Ms. Mulvaney was not disabled during the period in question and was, therefore, not entitled to DIB. R. at 28. The ALJ articulated his reasoning throughout the five-step sequential analysis for determining disability for purposes of eligibility for benefits. R. at 21-26. At step one of his analysis, the ALJ concluded that Ms. Mulvaney had not engaged in substantial gainful activity since the alleged begin date of disability on July 20, 2000. R. at 21. Although Ms. Mulvaney had been employed as a bus driver during 2001, she had earned only $1,013.62 over six months. R. at 21.

At step two, the ALJ concluded that Ms. Mulvaney had established the existence of at least one medically determinable, severe impairment or its equivalent based on the opinions of the DDS physician consultants that Ms. Mulvaney has "discogenic and degenerative disorders of her back and osteoarthrosis." R. at 21. The ALJ agreed with the conclusions of DDS mental health consultants that Ms. Mulvaney's mental impairments were not "severe" when viewed independently, but throughout the remaining analysis the ALJ considered the combined effects of the mental impairments and the severe physical impairments. R. at 21.

At step three, the ALJ found that Ms. Mulvaney's

impairments, even in combination, did not meet or equal any of the impairments in the Listings. R. at 21. The ALJ relied on the implicit conclusions of the consulting physicians and the explicit conclusions of the mental health consultants in this regard. R. at 21-22.

At step four, the ALJ determined that Ms. Mulvaney could not perform her previous work based on a restrictive RFC. R. at 25. With regard to her physical limitations, the ALJ described the "persuasive" opinions of the DDS physicians that Ms. Mulvaney could perform the full range of light work or light work with no more than occasional climbing of ladders, ropes, or scaffolds. R. at 22. Of particular significance to the ALJ here were Ms. Mulvaney's ability to walk without an assistive device, the lack of disuse atrophy in her extremities, and Dr. Maltezos' observation that she could "move about without obvious difficulty." R. at 23.

With regard to her mental impairments, the ALJ found that Ms. Mulvaney experienced only mild limitations in activities of daily living and social functioning, and "no episode of decompensation." R. at 24. However, the ALJ concluded that Ms. Mulvaney did experience moderate limitations in concentration as a result of her mental and physical impairments. R. at 24. In reaching his conclusion, the ALJ found the opinions of the DDS

mental health consultants to be persuasive and consistent with the medical evidence showing a chronic depressive disorder. R. at 23-24. The ALJ found this depressive disorder to be a medically mild one, based on a clinical interview and the May 2004 psychological examination. R. at 23-24.

Finally, with regard to Ms. Mulvaney's pain, the ALJ relied on the opinions of the DDS consulting physicians and the medical experts, which he found more persuasive than Ms. Mulvaney's own claims or the opinions of her treating physicians. R. at 25. As to Ms. Mulvaney's claims, the ALJ specifically found her allegations to be "not fully credited." R. at 27. However, he did give them some weight, indicating that "there has been only some exaggeration by the claimant of the intensity, frequency, and duration of her symptoms, strategies to minimize them, and consequent functional limitations." R. at 26.

The ALJ declined to adopt the RFC completed by Dr. Astroth and endorsed by Dr. Mozwecz. Likewise, the ALJ declined to adopt all of the opinions in the treating psychiatrist's evaluation report. R. at 24. The ALJ was "convinced that both her chiropractor and her treating psychiatrist, understandably, have accepted the sincerity of the claimant's complaints." R. at 25.

On the other hand, the ALJ gave great weight to the opinions of the DDS consulting physicians and the medical experts which

"reflect their perceptions that the claimant's allegations regarding the frequency and duration of intense episodes of pain are disproportionate to the established anatomical abnormalities." R. at 25. The ALJ described the opinions of the medical experts as "the most informed, consistent with the medical evidence of record, convincing, and consistent with the record as a whole (20 C.F.R. § 404.1527)." R. at 25.

Thus, the ALJ largely adopted the RFC assessment from the medical expert's testimony. R. at 25, 27. The ALJ found that Ms. Mulvaney could perform work that did not involve:

[m]ore than occasionally lifting and/or carrying even ten pounds at a time; standing and/or walking more than two hours during an eight hour work day; operat[ing] foot controls; climbing ladders, ropes or scaffolds; more than occasionally climbing ramps and stairs, balancing, stooping, kneeling, crouching, or crawling; more than occasionally using her hands to handle, finger or feel; or work at unprotected heights or around dangerous moving machinery.

R. at 27. The ALJ found that, given these limitations, Ms. Mulvaney could not perform her previous work, since even the least demanding job (billing clerk) would require frequent use of the hands. R. at 25.

Finally, at step five, the ALJ determined that, despite "grossly restrictive limitations," Ms. Mulvaney could make a vocational adjustment and perform work outside her previous fields. R. at 26. The ALJ relied on the testimony of VE Pagella

36

that an individual with Ms. Mulvaney's vocational profile and RFC could work in any of three sedentary, unskilled service jobs: loss prevention clerk, information clerk, and charge account clerk. R. at 26. The ALJ found that the jobs proffered by the VE did exist in significant numbers in the national economy. R. at 26. Thus, the ALJ made a finding of "not disabled" for the period in question. R. at 26.

## Standard of review

In reviewing the ALJ's decision, the Court may not decide the facts, reweigh the evidence, or substitute its own judgment for that of the ALJ. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a plaintiff is disabled falls upon the Commissioner, not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990); *see also Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989) (the ALJ has the authority to assess medical evidence and give greater weight to that which he finds more credible). Rather, the Court must accept findings of fact that are supported by "substantial evidence," 42 U.S.C. § 405(g), where substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Herron*, 19 F.3d at 333 (quoting *Richardson v. Perales*, 403 U.S. 389, 401 (1971)).

37

This does not mean that the Commissioner (or the ALJ) is entitled to unlimited judicial deference, however. An ALJ must sufficiently articulate his assessment of the evidence to "assure us that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). When the ALJ fails to mention rejected evidence, "the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Zblewski v. Schweiker*, 732 F.2d 75, 79 (7th Cir. 1984) (quoting *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981) and holding that such explanation is "absolutely essential for meaningful appellate review").

Further, while the Court does not require a written evaluation of every piece of testimony and evidence submitted, a minimal level of articulation of the ALJ's assessment of the evidence is required in cases in which considerable evidence is presented to counter the agency's position. *Zblewski*, 732 F.2d at 78-79. And finally, the evidence supporting the agency's decision must be substantial "when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the [agency's] view." *Id.* at 78 (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 472, 477-78 (1951)) (where substantial evidence in favor of the agency's decision cannot be

determined in isolation from the aggregate record.).

## Social Security Regulations

The Social Security Regulations (the "Regulations")
prescribe a five-step sequential analysis to determine whether a
claimant is disabled. 20 C.F.R. § 404.1520 (2003). The ALJ must
consider whether the claimant: (1) is presently employed; (2) has
a severe impairment or combination of impairments; (3) has an
impairment that meets or equals any impairment listed in the
Regulations as being so severe as to preclude gainful activity;
(4) is unable to perform her past relevant work; and (5) is
unable to perform any other work existing in significant numbers
in the national economy. *Young v. Sec'y of Health & Human
Servs.*, 957 F.2d 386, 389 (7th Cir. 1992); 20 C.F.R. § 404.1520.
A negative answer at any step other than step three precludes a
finding of disability. *Young*, 957 F.2d at 389. The claimant has
the burden of proof at steps one to four. *Id.*; *Balenton v.
Halter*, 156 F. Supp. 2d 776, 782 (N.D. Ill. 2001). If she meets
that burden, the burden shifts to the Commissioner at step five
to show that the claimant has the ability to engage in other work
existing in significant numbers in the national economy. *Young*,
957 F. 2d at 389; *Balenton*, 156 F. Supp. 2d at 782.

## Discussion

Ms. Mulvaney argues that the ALJ's decision must be reversed

39

or remanded because: (1) the ALJ improperly discredited her pain allegations, (2) the ALJ failed to give controlling weight to the opinions of her treating physician and treating psychiatrist, (3) the ALJ failed to consider the impact of missed workdays, drowsiness, and impaired concentration on her ability to work, and (4) the ALJ failed to consider the impact of her psychiatric problems on her ability to work. The Court will examine these arguments in turn.

## A. The ALJ's Credibility Determinations

Ms. Mulvaney first argues that the ALJ improperly discredited her complaints of pain. The Commissioner responds that the ALJ's credibility determination is reasonable and should not be disturbed under the deferential standard of review. The Commissioner also argues that the ALJ's RFC findings did accommodate those significant limitations and symptoms that were claimed by Ms. Mulvaney and corroborated by her underlying impairment.

Generally, courts will not disturb an ALJ's credibility findings unless they are patently wrong. *Sims v. Barnhart*, 309 F.3d 424, 431 (7th Cir. 2002). However, courts review an ALJ's credibility determination with less deference when it rests on "objective factors or fundamental implausibilities rather than subjective considerations." *Clifford v. Apfel*, 227 F.3d 863, 872

(7th Cir. 2000); *Herron*, 19 F.3d at 335.

When a claimant's allegations of pain are supported by medical signs and findings, an ALJ must consider them and cannot discount them without articulating specific reasons for doing so. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Under Social Security Ruling 96-7p, such a credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (quoting SSR 96-7p). For example, where an ALJ discounts a claimant's testimony because it is inconsistent with the objective medical evidence and the claimant's activities, the ALJ must explain how it is inconsistent. *Id.*

The ALJ found Ms. Mulvaney's allegations not fully credited "for the reasons explained in the body of [his] decision." R. at 27. His decision contains two relevant sections. First, the ALJ wrote that the opinions of the medical expert and the reviewing physician consultants to the DDS "reflect their perceptions" that Ms. Mulvaney's claimed symptoms are "disproportionate to the established anatomical abnormalities."

41

R. at 25.   The ALJ should have explained this observation, but he
did not.

The opinions of the DDS consultants support the ALJ's
conclusion in that they found Ms. Mulvaney capable of light work
in 2001 and 2002.  R. at 285, 362.  But the 2001 opinion contains
no explanation of its findings, and the 2002 opinion, which does
explain its findings, was based on an incomplete record; the DDS
physician who reviewed Ms. Mulvaney's file in 2002 did not have
before him evidence of her disc herniation.  R. 278-85, 356-57;
see 20 C.F.R. § 404.1527(d)(3) (providing that "the weight we
will give [nonexamining sources'] opinions will depend on the
degree to which they provide supporting explanations for their
opinions. We will evaluate the degree to which these opinions
consider all of the pertinent evidence in your claim . . ..").

The opinions of the medical expert also appear to support
the ALJ's conclusion.  Dr. Grizadas suggested that a June 2003
report by Ms. Mulvaney's treating physician might show that she
is misrepresenting her condition.  R. at 449.  The report
revealed that she had only occasional lower back pain, took no
chronic medication, and had a normal neurological examination.
R. at 393.  But, again, that opinion is problematic because it is
based on incorrect information; Dr. Grizadas quoted from a report
he said was prepared in June 2003, but it was actually prepared

42

in June 1993, seven years prior to Ms. Mulvaney's claimed period

of disability. R. at 449. And Dr. Grizadas otherwise testified

that Ms. Mulvaney's claims of chronic pain were consistent with

the findings of severe degenerative arthritis. R. at 448-49.

In a second relevant portion of the decision, the ALJ states

that Ms. Mulvaney's claimed symptoms are not corroborated by the

frequency of her chiropractic visits. R. at 23. Here, the ALJ

failed to adequately explain how Ms. Mulvaney's claims were

inconsistent with her chiropractic treatment. *See Zurawski*, 245

F.3d at 887. The ALJ referred to December 1999 and June 2001 as

periods in which Ms. Mulvaney alleged intense pain, but did not

show how her claims are inconsistent with the frequency of her

chiropractic visits, which appear to have been at least weekly

during these months. R. at 290-92, 294, 315-17. Instead, the

ALJ pointed to the "temporary" nature of Ms. Mulvaney's

disability, as indicated by Dr. Maltezos on a request form for a

Disabilities Plates or Parking Placard in June 2001. R. at 231.

The ALJ implied that the "temporary" designation contradicts Ms.

Mulvaney's simultaneous complaints of an "acute onset of stabbing

hip pain." R. at 23. On that form, one of the bases for

disability is "cannot walk 200 feet without stopping to rest,"

and the ALJ does not explain how this temporary disability

contradicts Ms. Mulvaney's claims. R. at 231. Moreover, Ms.

43

Mulvaney testified that she still used a disabilities plate in 2003. R. at 460. To further support his assertion, the ALJ pointed to Exhibit 11 F, p. 31, where a treating physician described "a history of occasional low back pain, no chronic medication, and semi-regular chiropractic visits." R. at 23. Unfortunately, the ALJ adopted the inaccurate reading of Dr. Grizadas and referred to this 1993 note as a "June 3, 2003 treatment note." R. at 23.

In the end, the ALJ may appropriately find that Ms. Mulvaney's claims are not fully credible. There is certainly a great deal of evidence in the record that would support such a finding. But unless and until the ALJ explains his credibility findings, this Court simply cannot afford Ms. Mulvaney a meaningful review. The ALJ's decision cannot be upheld where the reasons given by the ALJ "do not build an accurate and logical bridge between the evidence and the result." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

The record contains extensive medical evidence supporting Ms. Mulvaney's complaints of pain. As the ALJ noted, Ms. Mulvaney provided medical evidence showing grade II spondylolisthesis, disc herniation, arthritis of the cervical and lumbar spine, and moderate carpal tunnel syndrome. Record at 22-23. Also noted by the ALJ were Ms. Mulvaney's treatment for low

44

back pain, including chiropractic treatment, pain medication, and lumbar epidural steroid injections. R. at 23. While the ALJ refers to Dr. Maltezos' August 2000 report to show that Ms. Mulvaney is able to move about without difficulty, he does not discuss subsequent reports by Dr. Maltezos describing the severity of her condition. R. at 23, 276, 268. Reports in 2001 show, for example, that Ms. Mulvaney's radicular symptoms had improved with steroid injections, but that her severe back pain from spondylolisthesis had not resolved and her spondylolisthesis had progressed. R. at 268. He asserted that an operation described as "large" and "not without risk" was justified "given her present level of chronic pain and dysfunction." R. at 268.

Remand is especially appropriate here because the ALJ's credibility determination drove not only the weight he afforded to Ms. Mulvaney's testimony, but, as discussed below, the weight he afforded to her treating sources. R. at 25.

Moreover, in finding Ms. Mulvaney not disabled, the ALJ looked predominantly – whether intentionally or mistakenly – at evidence from the earlier years and discounted much of the later evidence. Given the degenerative nature of Ms. Mulvaney's ailments, even if his finding of not disabled stands for the earlier years, he may find her disabled at some point along the continuum. Ms. Mulvaney testified at the second hearing session

that her condition had worsened since the first session, and the ALJ does not mention this testimony. R. at 486. Ms. Mulvaney testified that her increased pain affects her mental state. She does not sleep well at night, naps during the day, has feelings of worthlessness, and occasionally cries uncontrollably. R. at 487-88. Her daily activities have apparently become more limited. She testified that she does not get in and out of the bathtub, vacuum, or clean the bathtub and toilet. R. at 494. She testified that she only briefly visits with family, and sits at the back of church so that she can move about. R. at 490. She also testified that she has difficulty using her legs, which has caused her to fall and injure herself, and that she has difficulty with her arms, which causes her to unexpectedly drop things. R. at 490, 492. Thus, a finding of disabled might be justified at some point; in that event, the question would be whether that point came when she was covered for benefits.

## B. The ALJ's Consideration of Evidence from Treating Sources

Ms. Mulvaney next argues that the RFC assessments of Dr. Astroth and Dr. Gokhale are entitled to controlling weight because they are not inconsistent with the other substantial evidence in this case. She further argues that the ALJ should have identified the factors in 20 C.F.R. § 404.1527(d)(2) pertinent to his denial of controlling weight. The Commissioner

responds that the opinions of the treating sources are inconsistent with the record as a whole, and that the ALJ reasonably discounted them. The Commissioner also argues that the ALJ adequately explained why he did not adopt their opinions.

The ALJ discounted the opinions of Dr. Astroth and Dr. Gokhale to the extent that he believed they were influenced by Ms. Mulvaney's claims, which he found to be not entirely reliable. R. 25; see Rice v. Barnhart, 384 F.3d 363 (7th Cir. 2004) (approving of ALJ's decision to give less weight to treating physician's opinions that were apparently "a recitation of a claimant's subjective complaints"); White v. Barnhart, 415 F.3d 654, 659 (7th Cir. 2005) (approving of ALJ's decision to give less weight to treating physician's opinions that were influenced by claimant's discredited subjective complaints and inconsistent with opinions of examining physicians); Jones v. Barnhart, 269 F. Supp. 2d 1013, 1020 (N.D. Ill. 2003) (same); but see Barrett v. Barnhart, 355 F.3d 1065, 1067 (7th Cir. 2004) (holding that a physical therapist's partial reliance on subjective complaints did not justify ALJ's decision to disregard her medical opinions.).

"A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent

47

with other substantial evidence." *Clifford*, 227 F.3d at 870 (citing 20 C.F.R. § 404.1527(d)(2)). When denying controlling weight to the opinion of a treating physician, an ALJ must minimally articulate his reasons for doing so. *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004). In addition, the ALJ must apply certain factors to determine the weight to be given to the opinions of a treating physician denied controlling weight. 20 C.F.R. § 404.1527(d)(2). These factors are: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the extent to which the opinion is supported by relevant evidence; (4) the extent to which the opinion is consistent with the record as a whole; (5) any specialization; and (6) other factors. 20 C.F.R. § 404.1527(d)(2)-(d)(6).

The Court finds that the ALJ committed no error in declining to give controlling weight to Dr. Astroth's RFC assessment. First, the ALJ was not required to give controlling weight to Dr. Astroth's opinions based on Dr. Mozwecz' approval of his RFC assessment. Although it is true that Dr. Mozwecz, Ms. Mulvaney's treating physician, approved Dr. Astroth's RFC assessment by signing the last page of the assessment and writing "agree with above assessment," R. at 418, he did so without any independent assessment or explanation. *Cf. Fischer v. Barnhart*, 256 F. Supp.

2d 901, 907 (E.D. Wis. 2002) (where doctor's report was drafted by plaintiff's attorney, form of the opinion is one factor to consider when determining its evidentiary weight); *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). Dr. Mozwecz' concurrence may, however, add credibility to Dr. Astroth's opinion, given that Dr. Mozwecz has had a lengthy treating relationship with Ms. Mulvaney, including a contemporaneous visit on March 29, 2004. R. at 427.

Second, Dr. Astroth is a chiropractor, and the presumption of controlling weight does not apply to chiropractors. Under the Regulations, licensed physicians are "acceptable medical sources" for establishing an impairment, while chiropractors are "other sources" which "may" be used to show the severity of an impairment or how it affects one's ability to work. 20 C.F.R. § 404.1513(a)(1), (d)(1). An ALJ has greater discretion when weighing the opinions of "other sources," including chiropractors. *See Wright v. Barnhart*, No. 04-0215, 2005 U.S. Dist. LEXIS 15452, at **11-13 (S.D. Ind. July 25, 2005) (citing *Diaz v. Shalala*, 59 F.3d 307, 314 (2d Cir. 1995)); *Koschnitzke v. Barnhart*, 293 F. Supp. 2d 943, 950 (E.D. Wis. 2003) (holding that physician's assistant is not entitled to controlling weight because they are not an "acceptable medical source" within the Regulations); *Humphries v. Apfel*, No. 99-1200, 2000 U.S. Dist.

49

LEXIS 6541 (N.D. Ill. May 10, 2000) (approving of an ALJ's
decision to discount a chiropractor's opinions in part because
they are not an "acceptable medical source" under the
Regulations).

Third, as the Commissioner notes, Dr. Astroth's RFC
assessment is also inconsistent with other substantial evidence.
Dr. Astroth indicated that Ms. Mulvaney's pain would interfere
with the attention and concentration needed to perform even
simple work tasks on a constant basis. R. at 340. By contrast,
the psychiatrist who examined her in 2002 found her capable of
focusing her attention and understanding questions, and the
psychologist who examined her in 2004 found her capable of
recalling information, conveying general knowledge, performing
basic math problems, and exercising good judgment. R. at 340,
415, 428.

Similarly, the Court finds no error in the ALJ's decision to
decline to give controlling weight to Dr. Gokhale's evaluation.
Dr. Gokhale's evaluation is inconsistent with the other
substantial evidence in the record in at least two respects. For
example, Dr. Gokhale noted Ms. Mulvaney's marked or extreme
difficulty in several areas of daily living, including grooming
and personal hygiene. R. at 97. These findings are inconsistent
with the observations of the examining psychiatrist, who called

50

her grooming "satisfactory" in 2002, and the examining

psychologist, who described her as "cleanly dressed" and "kempt

in her appearance" in 2004. R. at 340, 429. The ALJ also

observed that she was "appropriately dressed" and "stylishly

coifed." R. at 25. Second, Dr. Gokhale found that Ms. Mulvaney

had marked or extreme difficulty in focusing attention,

concentrating, and persisting in tasks. R. at 98. As described

above, the examining psychiatrist and examining psychologist

found her capable of basic mental activities such as

understanding questions and performing basic math problems. R.

at 340, 415, 428. Because his findings are inconsistent with

those of two examining mental health consultants, Dr. Gokhale's

opinions are not entitled to controlling weight. See 20 C.F.R. §

404.1527(d)(2).

Having said all of this, because the ALJ's decision

regarding the weight to be given to Dr. Astroth's and Dr.

Gokhale's findings was tied to his determination that Ms.

Mulvaney's pain complaints were not fully credible, to the extent

that he reconsiders his credibility findings on remand, he may

also need to reconsider the weight to be given to the opinions of

these treaters.

Relatedly, in her reply brief, Ms. Mulvaney argues that the

ALJ improperly "played doctor" when he relied on selected

portions of her treating sources' reports and on his own

observations of her appearance to conclude that she was not

disabled. Contrary to Ms. Mulvaney's argument, an ALJ is

entitled to rely on portions of a medical report while refusing

to adopt portions of the same report if he finds them to be less

reliable. See Diaz v. Chater, 55 F.3d 300, 307-08 (7th Cir.

1995). The ALJ must weigh the medical evidence and the reviewing

court may not reweigh the evidence on appeal. Id. In this case,

the ALJ did credit some pieces of medical evidence over others.

But he did not substitute his own judgment for that of the

medical professionals. Indeed, in formulating Ms. Mulvaney's RFC

the ALJ relied heavily on the testimony of a medical expert. The

ALJ noted his observations of Ms. Mulvaney, but he did not use

them to draw inappropriate medical conclusions. Accordingly, the

Court rejects Ms. Mulvaney's argument on the issue.

## C. Evidence of Missed Workdays and Drowsiness/Impaired Concentration

Ms. Mulvaney next argues that the ALJ failed to consider the

impact of missed workdays, and of her pain and her pain

medication, on her ability to perform the three jobs proffered by

the VE. With regard to absences, the RFC assessment completed by

Dr. Astroth and approved by Dr. Mozwecz stated that Ms. Mulvaney

would miss more than four workdays per month due to her medical

problems. R. at 417. And, when questioned by Ms. Mulvaney's
attorney, VE Pagella testified that a hypothetical individual
with Ms. Mulvaney's vocational profile and RFC who missed four or
more days of work per month would not be capable of performing
any substantial gainful activity. R. at 505. That testimony is
unrebutted in the record. In addition, Ms. Mulvaney's testimony
tends to support Dr. Astroth's finding. For example, she stated
that when she tries to cook or clean at home she sometimes
'overdoes it' and is unable to do anything the next day. R. at
459. Also, she described by letter an incident in 2003 when her
leg "gave out" on her, and she fell and was in bed for three days
"packed in ice." R. at 149. Finally, she testified that she is
sometimes overwhelmed by her emotions. R. at 488.

Yet, as Ms. Mulvaney notes, the ALJ never mentions the issue
of missed workdays. An ALJ need not discuss every piece of
evidence in the record. *Dixon*, 270 F.3d at 1176. However, he
must show that he has examined the evidence in its entirety.
*Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003). In
this case the ALJ failed to mention the issue of missed workdays.
Here, because he never mentions the issue, the Court cannot tell
whether he ignored the evidence, or whether he considered it and
rejected it for some reason.

Ms. Mulvaney also argues that the ALJ failed to consider the

53

effect of her pain and her pain medication on her ability to perform the three jobs proffered by the VE. Because the VE testified that concentration would be required in each of the jobs at least sixty-seven percent of the time, Ms. Mulvaney argues that her allegations of constant pain and drowsiness from pain medication preclude her from performing those jobs.

In fact, the ALJ did consider Ms. Mulvaney's impaired concentration in his analysis. As the Commissioner points out, the ALJ relied on the testimony of ME Grizadas, who explicitly acknowledged that Ultram and Darvocet, the pain medications taken by Ms. Mulvaney, can cause drowsiness. R. at 508. Based on the RFC described by ME Grizadas, the VE testified that Ms. Mulvaney could perform any of three service jobs. R. at 502-03. Consistent with the expert testimony, the ALJ found that Ms. Mulvaney's drowsiness and impaired concentration from her pain and pain medication would not preclude her from performing any substantial gainful activity. R. at 24.

The ALJ did not ignore evidence of Ms. Mulvaney's drowsiness and impaired concentration. He elicited expert testimony on the issue of drowsiness from pain medication, and made a finding of moderate limitation in concentration based on the combination of Ms. Mulvaney's mental and physical impairments. This Court is able to trace the ALJ's reasoning on this issue and finds no

legal error.

## D. Ms. Mulvaney's Psychiatric Problems

Ms. Mulvaney next argues that the ALJ failed to consider the effect of her psychiatric problems on her ability to perform the three jobs identified by the VE. She asserts that Dr. Gokhale's RFC assessment, if given proper weight, would require a finding of disabled because it shows that she cannot concentrate or work with the public, as required by the three jobs. The Commissioner responds that Dr. Gokhale's opinions were inconsistent with the other medical evidence and with Ms. Mulvaney's testimony, and that the ALJ reasonably declined to accept them.

In a psychiatric evaluation form for Ms. Mulvaney, Dr. Gokhale found a GAF score of fifty, and noted that she had been experiencing symptoms of a chronic affective disorder for more than three years. R. at 95. Dr Gokhale also noted that Ms. Mulvaney had marked or extreme difficulty with social functioning activities, including getting along with family, friends, neighbors, and strangers; cooperating with co-workers; and holding a job. R. at 97. Dr. Gokhale indicated that she had marked or extreme difficulty with the concentration, persistence, or pace needed for timely completion of tasks in a work setting. R. at 98.

As the Commissioner notes, the ALJ did not afford

controlling weight to the opinions of Dr. Gokhale. R. at 24-25.
The ALJ mentioned the medical evidence of Ms. Mulvaney's mental
condition, including Dr. Amdur's evaluation from April 2002, the
testimony of Dr. Cools, the May 2004 psychological evaluation,
and Dr. Gokhale's September 2004 report. R. at 23-24. The ALJ
weighed the medical evidence and found that Ms. Mulvaney
experienced only moderate limitations in concentration and mild
limitations in activities of daily living and social functioning
as a result of her mental condition. R. at 24. The ALJ's
decision shows that he did consider Ms. Mulvaney's psychiatric
problems, but did not find them to affect her ability to perform
substantial gainful activity. Further, his decision is
consistent with the opinions of several reviewing and examining
mental health consultants. For example, Dr. Amdur found that Ms.
Mulvaney had some limitations on her ability to concentrate, but
observed that she could focus her attention, speak coherently,
and understand questions. R. at 340. Further, Ms. Rains
indicated that Ms. Mulvaney's adjustment disorder would result in
only mild limitations in social functioning and maintaining
concentration. R. at 351. And, based on his examination, Dr.
Rudolph concluded that Ms. Mulvaney had appropriate memory recall
and was able to use good judgment and reasoning skills. R. at
430-31. He observed that she was cleanly dressed, polite, and

coherent. R. at 429-30. Although the ALJ credited other
opinions over those of Dr. Gokhale, he did not ignore evidence of
Ms. Mulvaney's psychiatric problems. It was within the
discretion of the ALJ to credit other evidence of Ms. Mulvaney's
psychiatric problems over the evidence provided by Dr. Gokhale,
and he did not improperly fail to consider this issue.

On remand, however, the ALJ should explain more clearly his
findings on the issue of decompensation. The ALJ noted a mental
health consultant's finding of "no episode of decompensation"[3]
and he noted Dr. Gokhale's finding of "a continuing episode of
decompensation of more than two years' duration," and he then
found that there was no period of decompensation. While the ALJ
appears to be resolving conflicting medical opinions, this is not
precisely the case. The finding of "no episode of
decompensation" was made in April 2002, while Dr. Gokhale's
report was completed in September 2004, more than two years
later. R. at 100, 351. Thus, the two findings are not directly
in conflict and more analysis is required.

And, as discussed above, the credibility analysis conducted
on remand may impact the analysis of Ms. Mulvaney's psychological
problems, since the ALJ discredited Dr. Gokhale's opinions

---

[3] "Decompensation is defined by Social Security as exacerbations
or temporary increases in symptoms or signs accompanied by a loss
of adaptive functioning." R. at 99.

57

largely because of his reliance on Ms. Mulvaney's discredited subjective complaints.

## Conclusion

For the reasons set forth above, the Court finds that the ALJ's credibility determinations are inadequate, and that remand is, therefore, appropriate. Accordingly, the Court grants, in part, Ms. Mulvaney's Motion for Summary Judgment and denies the Commissioner's Motion for Summary Judgment. The matter is remanded to the Commissioner for further proceedings consistent with this opinion.

Date: August 3, 2006

ENTER:

ARLANDER KEYS
United States Magistrate Judge